Agnes Eagen, as Administratrix of the Estate of George
Eagen, Deceased, Respondent, v. Buffalo Union Terminal
Railroad Company, Appellant.

Negligence — when railroad employee, whose negligence caused
the death of another employee, not vice-principal of the railroad
company, within the meaning of section 42a of the Railroad
Law.

The conductor of a train, used for conveying slag from a blast furnace to
a dump, fell while attempting to couple an empty car to the end of
the train, and was run over by the wheels of the rear car, receiving
injuries from which he died.   The crew of the train consisted of four
persons, an engineer, a fireman, the conductor and a switchman, or
helper.   The engineer and fireman could not see the decedent, as the
train backed slowly toward him, and the switchman was giving signals
with his hands to the engineer so that the latter could control the train.
The switchman testified that he gave the signal to stop, when he saw
decedent was in danger, and that when the engineer failed to obey,
he called out to stop.   The train was then stopped, but not until the
wheels of the rear car had run upon the body of the decedent.   The
engineer testified that the switchman gave no signals with his hands
prior to calling out to stop and that he then stopped immediately.
Each of these two witnesses, the only persons who had personal knowl-
edge of the accident, testified in substance that the accident occurred
by reason of the negligence of the other.   *Held*, upon the authority of
*Hallock* v. *New York, Ontario & West. Ry. Co.* (197 N. Y. 450), that it
was erroneous for the trial court to charge that, under the statute (sec-
tion 42a of the Railroad Law), the switchman was a vice principal of
the railroad company.

*Eagen* v. *Buffalo Union Terminal R. R. Co.*, 134 App. Div. 995, reversed.

(Argued January 17, 1911; decided January 27, 1911.)

Appeal from a judgment of the Appellate Division of the
Supreme Court in the fourth judicial department, entered
November 30, 1909, affirming a judgment in favor of plain-
tiff entered upon a verdict and an order denying a motion for
a new trial.

The nature of the action and the facts, so far as material,
are stated in the opinion.

*Alfred L. Becker* for appellant. The defendant was not liable for the negligent acts, if any, of Donahue, and the charge upon this point was erroneous. (*Hallock* v. *N. Y., O. & W. R. R. Co.,* 197 N. Y. 450.)

*Joseph A. Wechter* for respondent. Kelley, in physical control of the engine, and Donahue, in physical control of a signal, were vice-principals for whose negligence the railroad corporation is liable to Eagen's widow and children. (*Schradin* v. *N. Y. C. & H. R. R. R. Co.,* 124 App. Div. 705; *Brown* v. *N. Y. C. & H. R. R. R. Co.,* 126 App. Div. 240; 196 N. Y. 542.)

CHASE, J.   Plaintiff's intestate was injured while employed as the conductor of a train used, among other things, in transporting molten slag or dross from the furnaces of the Buffalo Union Furnace Company to a place where the slag was deposited called "the dump." The train in use at the time the intestate was injured consisted of an engine to which was attached in front a flat car, a side dump car known as a "Weimar kettle" and an end dump car known as a "Hartman kettle" in the order named. The crew consisted of four persons, an engineer a fireman, the intestate, who was the conductor and the person in charge of the train, and a helper or switchman.

On the day of the accident the Hartman kettle was filled with molten slag and taken to the dump and emptied. The empty kettle car was then removed from the immediate place where it had been emptied and uncoupled from the other cars making up the train. It had been coupled to the next car by means of a heavy iron bar fourteen feet two inches long and three and one-fourth inches in diameter, and which weighed about 420 pounds. One end of the bar was left connected with the Hartman kettle, and the other end was temporarily upheld by a standard placed under it upon the ground. Subsequently the Weimar kettle was taken over another side track to the dump and emptied. In making up the train of

empty cars, the engine, flat car and the Weimar kettle were returned by way of a switch to the side track upon which the unloaded Hartman kettle had been left.

The plaintiff's intestate proceeded in advance of the train to the end of the bar, which was sustained by the standard, for the purpose of inserting it into the opening of the drawhead of the Weimar kettle trucks when that car should reach the place on the side track where a coupling could be made. The engineer and fireman were upon the engine and could not see the intestate as he stood at the end of the bar. The intestate's helper walked along by the side of the Weimar kettle in plain sight of the engineer as the train was pushed toward the place where the intestate was standing. It was the usual practice for such helper to give the necessary signals with his hands to the engineer, so that the movement of the train could be controlled by the engineer in making a coupling with the Hartman kettle. The train was running on an up grade of two or three per cent, and at a speed of about one and one-half miles per hour. As the train approached the intestate he lifted the end of the bar, which required him to hold a weight of about 210 pounds. It was necessary to lift and then lower the bar, because the end as it rested upon the standard was two and one-half inches too high to enter the opening of the drawhead of the Hartman kettle. As he lifted the bar from the standard, the standard fell upon the ground, and, for some reason that does not appear, before the Weimar kettle reached the place where the bar could be inserted into the drawhead, the intestate fell across the tracks with the end of the bar to some extent upon him. The helper testified that when the wheels of the approaching car were eight feet from the intestate he saw that "the bar had the best of him," and he gave the ordinary stop signal and continued such signal to stop the train until he saw that the intestate was falling and the engineer had failed to obey his signals, and the wheels of the Weimar kettle were within about one foot of the intestate, and that he then called out to the engineer to stop, and the train was

stopped, but not until one of the wheels had run partially upon the body of the intestate and so injured him internally that he died a few hours thereafter.

The engineer testified in substantial corroboration of the intestate's helper, except that he testified that the helper did not give him any signal with his hands to stop prior to his calling out " whoa," and that when the helper so called to him he stopped the train before it proceeded more than one foot.

The only witness who actually saw the wheel of the car run upon or against the intestate was the helper, and the only witnesses sworn that had personal knowledge of the accident were the helper and the engineer. Each of these two witnesses testified in substance that the accident occurred by reason of the lack of care of the other. They were at common law each fellow-servants of the intestate.

It is provided by section 42a of the Railroad Law that " In all actions against a railroad corporation, foreign or domestic, doing business in this state, * * * for personal injury to, or death resulting from personal injury of any person, while in the employment of such corporation, * * * arising from the negligence of such corporation, * * * or employees, and every employee, or his legal representatives, shall have the same rights and remedies for an injury, or for death, suffered by him, from the act or omission of such corporation * * * or employees, as are now [1906] allowed by law, and, in addition to the liability now existing by law, it shall be held in such actions that persons engaged in the service of any railroad corporation, foreign or domestic, doing business in this state * * * who are entrusted by such corporation * * * with the authority of superintendence, control or command of other persons in the employment of such corporation * * * or with the authority to direct or control any other employee in the performance of the duty of such employee, or who have, as a part of their duty, for the time being, physical control or direction of the movement of a signal, switch, locomotive engine, car, train or telegraph office, are vice-principals of such corporation

31

\* \* \* and are not fellow-servants of such injured or deceased employee." (Cons. Laws, ch. 39, section 42a.)

The court in charging the jury in this case quoted from said statute and then said: "Before this law was passed, gentlemen of the jury, it would have been impossible to bring this action and to have succeeded against the defendant, because under the older law this switchman, Mr. Donahue, and this engineer, Mr. Kelley, would have been known as co-employees or fellow-servants, and the recovery, if any, would necessarily have to be procured against them and not against this defendant. But this statute which I have read to you, and which I now desire to point out, especially exempts those individuals from the co-employee or fellow-servant class and makes them vice-principals. That is, they occupy for all purposes of responsibility the identical position of the defendant railroad company itself."

In *Hallock* v. *New York, Ontario & West. Ry. Co.* (197 N. Y. 450) the plaintiff's intestate was a station agent in the employ of the defendant. In front of the station where the intestate was employed, and running between the station and a main track of the defendant's railroad, was a side or switch track. On the side track there were standing certain freight cars. A short time before the accident a freight train arrived on the main track in which was a car to be left at that station and the plaintiff's intestate directed the conductor of the freight train to place such car behind two of the cars then standing upon the side track. It necessitated several movements of the freight train and before the work of necessary switching had been fully completed a passenger train arrived. The plaintiff's intestate left the station and went toward the passenger train. On his way he met a third person and entered into conversation with him for two or three minutes, and in so doing stood upon or near the side track. While so standing he was struck by a car which was being backed down upon the side track by the freight engine and he was so injured that he subsequently died. This court said: "The evidence showed that the rear brakeman saw the deceased on

the side track at some distance from the point at which the accident occurred, as he says, either a car's length or two distant. The brakeman testified that he called out to the deceased and the man who was with him and expected that they would move away. It is contended for the plaintiff that the warning given was insufficient, and the brakeman should have signaled the engineer to stop the train. If it be assumed that the evidence was sufficient to justify a finding of negligence on the brakeman's part, the question remains whether the defendant was responsible to this plaintiff for that negligence. The deceased and the brakeman were fellow-servants and before the enactment of chapter 657 of the Laws of 1906 (sometimes called the Barnes Act), concededly the defendant would not have been liable for injury to one servant by the negligence of a co-servant. That statute, however, changed the rule as to the liability for the misconduct of certain railroad employees. * * * The rear brakeman was not a vice-principal within the provisions of this statute. His duty to signal or convey information to the engineer of when the train had approached the point at which it should be stopped, a thing which the engineer himself could not observe because of the position of the engine at the rear of the train, did not, in any proper sense of the term, give him authority to control or direct the engineer in the movement of the train. The direction and control referred to in the statute means that which is conferred by or proceeds from superior authority, not from the mere fact that the engineer had to rely on an inferior employee to discern something which he could not see for himself. * * * But the statute cannot be extended so as to include cases where the notice or information or warning conveyed by an employee to another employe is a mere incident of the employee's duty. In the movement of the cars in the making up of trains and the distribution of cars when the train has arrived at its destination, numberless notices, warnings or signals, if they are to be called such, must be given by one trainman to the others and often finally to the conductor. Errors or negligence in these respects, unfortunately,

are most common causes of injuries to employees in the movements of railroads. If the legislature had intended to make a railroad company liable in all such cases for injuries to its employees occasioned by the negligence of co-employees, the intent would have been very readily expressed by simple and clear language, while the present statute seems, on the contrary, to plainly confine liability for such injuries solely to negligence on the part of certain specified employees. We are of opinion, therefore, that the defendant was not liable for the negligence of the rear brakeman, if such negligence there was." (pp. 454–457.)

The facts in the *Hallock* case, upon which the decision rest, are such as to make that decision controlling upon us in determining whether the court erred in charging the jury in this case that Donahue was a vice-principal of the defendant. The charge of the court that Donahue was a vice-principal of the defendant was erroneous, and for that reason the judgment should be reversed and a new trial granted, with costs to abide the event.

CULLEN, Ch. J., GRAY, HAIGHT, WERNER, WILLARD BARTLETT and COLLIN, JJ., concur.

Judgment reversed, etc.